Dear Senator Fisher,
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask the following question:
 When a State institution of higher education enters into an agreement with a "for profit" or "not for profit" entity to collect rentals which are ultimately used to pay lease or bond obligations, does the collection of such rentals by a State institution of higher education cause this financing structure to be subject to the provisions of the Bond Oversight and Reform Act?
¶ 1 Our understanding of the fact situation underlying this question is as follows: Several higher education institutions have recently experienced increased demand for student housing. In some situations, a nonprofit entity qualified under26 U.S.C. § 501(c)(3) of the United States Internal Revenue Code of 1986, as amended ("Section 501(c)(3) entity") has leased unimproved land from the university, and pursuant to a lease agreement has built apartments or other multifamily dwelling units for use by students. Financing for the projects has come from tax-exempt revenue bonds issued by a municipal- or county-beneficiary public trust whose jurisdiction includes the university property.[1] Proceeds of the bonds are held by a trustee bank pending project construction. The trustee bank also maintains a revenue fund into which are deposited revenues from rental of the housing units, and a debt service fund for payment of principal and interest on the bonds when due.
¶ 2 In some instances, a private for-profit management company collects monthly rents and manages the apartments on behalf of the Section 501(c)(3) entity under a management agreement.[2] In other instances, the university collects the rent payments for or on behalf of the Section 501(c)(3) entity, and submits them to the trustee bank for the bond issue to be used to pay debt service on the public trust's bonds issued for the project. Some of the agreements in which the university agrees to collect rent payments also provide that the university shall operate and maintain the facilities, and shall pay operating expenses (excluding trustee fees, insurance and auditing fees) if project cash flow is not sufficient. Further, under certain instances, the university is required to replenish the operating reserve fund if its balance should ever fall below a specified minimum amount.
¶ 3 The question is whether, in any or all of these scenarios, because of the university's involvement in the project, the financing transaction is subject to the Oklahoma Bond Oversight and Reform Act ("Act"), 62 O.S. 2001, §§ 695.1-695.11[62-695.1-695.11]?
¶ 4 As its name indicates, the Act provides oversight as to bond issues and other obligations of State governmental entities and certain local governmental entities. The Act creates the position of the Oklahoma State Bond Advisor[3] ("Bond Advisor") and also creates the Council of Bond Oversight[4]
("Council"). The Act defines "State Governmental Entity" as "the State of Oklahoma or any agency, board, commission, authority, department, public trust of which the state is the beneficiary or other instrumentality of state government, other than a public trust with the state as beneficiary whose jurisdiction is limited to one county. . . ." Id. § 695.3(4). "Local Governmental Entity" means "counties, cities and towns, school districts, public trusts of which a county, city or town or school district is the beneficiary or other political subdivision of the state[.]" Id. § 695.3(5).
¶ 5 The issuance of any obligations of a State governmental entity must be approved in advance by the Executive Bond Oversight Commission and the Legislative Bond Oversight Commission (now the Council of Bond Oversight — see n. 4), except for certain refunding obligations resulting in more favorable terms. Id. § 695.9(A). The Bond Advisor is to assist all State governmental entities proposing to issue bonds in the selection of professional advisors, the negotiation of fees, and the approval of fees, expenses and other costs of issuance. Id. § 695.7(c).
¶ 6 Certain local governmental entities may also be subject to the Act. Subsection C of Section 695.9 on bond issue approval provides as follows:
 Local Governmental Entities that propose to issue obligations to fund capital additions or expenditures which obligations are to be retired by rental payments from the state, user fees from the state or any other such payment made by any officer, department, board, commission, institution or agency of the state when such payment is a direct and expressed pledge made by the state for the retirement of debt by a Local Governmental Entity shall be governed by the provisions of subsections A and B of this section. Provided, funds which are collected by the state for distribution to a Local Governmental Entity or are appropriated or dedicated by the state to a Local Governmental Entity without the expressed purpose of retiring debt of said Local Governmental Entity shall not constitute a pledge as provided in this subsection.
Id. (emphasis added).
¶ 7 Further, the part of the Act requiring participation of the State Bond Advisor in selection of advisors and in monitoring of fees and costs provides:
 The provisions of this subsection shall apply to any Local Governmental Entity that proposes to issue obligations to fund capital additions or expenditures which obligations are to be retired by rental payments from the state, user fees from the state or any other such payment made by any officer, department, board, commission, institution or agency of the state. No Local Governmental Entity may utilize a lease, contract, or other agreement with a State Governmental Entity as collateral or security for a proposed Local Governmental Entity obligation unless such obligation has satisfied all of the provisions of this section.
Id. § 695.7(C)(2) (emphasis added).
¶ 8 Whether the Act applies, thus requiring the Bond Advisor to review selection and payment of advisors and requiring the local public trust to obtain Council approval of the bond issue, will depend on whether the source of payment of the bonds derives from an agreement between the State entity and the local governmental entity, as described in the above-cited statutes. For example, does the lease of unimproved land by the university to the Section 501(c)(3) entity, combined with the promise of the lessee to construct and finance student housing facilities, create a "direct and expressed pledge made by the state for the retirement of debt" requiring the intervention of the Council or of the State Bond Advisor? 62 O.S. 2001, § 695.9[62-695.9](C). Other related questions are, would the result change if the university were to collect the rental payments from students, and remit the payments to either the Section 501(c)(3) entity or the bond trustee for use in retiring the debt? What is the effect of an agreement on the part of the university to operate and maintain the facilities and thereby possibly incur costs in the event of a revenue shortfall?
¶ 9 As we understand the transaction, unimproved land is leased by the university as lessor to the Section 501(c)(3) entity, as lessee. Whatever rental payments are due on the land would be from the lessee to the lessor (i.e., the university). The public offering documents state that the bonds are not an obligation of the university. Only if the lessee violated the provisions of the lease agreement, and the lease provisions allowed the university to take possession of the real property with all improvements, would any rights or obligation arise as to the university. Were the university to retake the leased property before the bonds were fully paid, the property almost certainly would remain subject to the lien or security interest of bondholders on the improvements. 46 O.S. 2001, § 7[46-7]. Only then would the university need to decide whether it would make payments to bondholders on the bonds or allow the trustee bank, on behalf of bondholders, to foreclose the leasehold interest of the Section 501(c)(3) entity. Any liability on the part of the university is remote and contingent.
¶ 10 The kinds of "obligations to fund capital additions or expenditures which obligations are to be retired by rental payments from the state," referred to in Section 695.9(C) would include, for instance, bonds issued by a county public trust to construct a building which houses offices of a State agency, wherein the State agency agrees to make monthly lease payments subject to legislative appropriations, and the local trust uses the lease payments as security for, and the main source of repayment of, the local public trust's bond issue.
¶ 11 In the present case, depending on the language of the agreement between the Section 501(c)(3) entity, as lessee, and the university, such an obligation on the part of the State might be created. The university, as a State governmental agency, might become legally obligated through the agreement to make up shortfalls in operating revenues, and to replenish the operating reserve fund, thereby at least indirectly providing money securing the bonds.
¶ 12 Each of the statutes, Sections 695.7(C)(2) and 695.9(C), refer to situations where obligations are issued relying in whole or in part on "rental payments from the state, user fees from
the state or any other such payment made by any officer . . . or agency of the state."
¶ 13 In Board of County Commissioners v. Mullins,217 P.2d 835, 841-42 (Okla. 1950), where the county fair board leased county land and buildings to private individuals, but the county agreed to keep the buildings in good repair and to clean and disinfect them, the court held that an obligation was created on the part of the county extending past the current fiscal year, in violation of constitutional restraints. Thus, depending on the arrangements between the university and the Section 501(c)(3) entity, a financial obligation of the type described in the Act could be created.
¶ 14 Under the facts presented, if the university were to collect the monthly rents from students and remit them to the Section 501(c)(3) entity or to the bond trustee, depending on the wording of the agreement, the university may become obligated to pay operating deficits from its own budget. If the students do not generate or pay sufficient rentals with which the Section 501(c)(3) entity or the public trust can make bond payments, the Section 501(c)(3) entity, as lessee, may have recourse against the university. Whether a particular management and operation agreement obligates the university to make up revenue shortfalls from its budget is a question of fact which will depend on the precise language of each agreement, to be answered on a case-by-case basis, and thus cannot be addressed in an Attorney General Opinion. 74 O.S. 2001, § 18[74-18](b)(A)(5).
¶ 15 It is, therefore, the Opinion of the Attorney Generalthat:
 1. A financing transaction whereby a local governmental entity issues revenue bonds, loaning the proceeds thereof to a 26 U.S.C. § 501(c)(3)" Section 501(c)(3)" nonprofit entity or other private entity for construction of student housing facilities on land leased by a university to such entity, which creates no financial obligation on the part of the university or the State to make payments on such bonds, is not subject to the provisions of the Oklahoma Bond Oversight and Reform Act ("Act"). See 62 O.S. 2001, §§ 695.1-695.11[62-695.1-695.11].
 2. Collection by the university, on behalf of the Section 501(c)(3) entity, of monthly rental payments from students, and remittance of such payments by the university to the bond trustee for use in making debt service payments on the bonds would not, absent an obligation on the part of the university to cover project shortfalls from its budget, cause the transaction to become subject to the Act. 62 O.S. 2001, §§ 695.1-695.11[62-695.1-695.11].
 3. If the university, by agreement, becomes obligated to cover shortfalls in operating revenues or to replenish operating reserves from its budget, making the transaction rely in part on payments from the State, the transaction becomes subject to the Act. 62 O.S. 2001, §§ 695.1-695.11[62-695.1-695.11].
 4. Whether a particular agreement with respect to lease of land and operation and management of a student housing project causes a university to become obligated to make payments from its budget on which repayment of bonds would rely, is a question dependent on the wording of the agreement which cannot be answered here, but must be addressed on a case-by-case basis. 74 O.S. 2001, § 18b[74-18b](A)(5).
W.A. DREW EDMONDSON Attorney General of Oklahoma
LYNN C. ROGERS Assistant Attorney General
[1] Section 145 of the Code allows facilities owned by a Section 501(c)(3) entity to be financed through tax-exempt obligations. 26 U.S.C. § 145 (2002). In Oklahoma, the Section 501(c)(3) entity does not issue bonds directly, but borrows money from a public trust created pursuant to 60 O.S. 2001, §§ 176-180.4[60-176-180.4], or other eligible bond issuer. A public trust must obtain consent from the governing body of the municipal- or county-beneficiary, and must follow other applicable State and federal laws on bond issuance.
[2] We assume from your question that a Section 501(c)(3) entity is the lessee of the property, and a separate for-profit entity may be engaged to manage the project and collect rentals from students, pursuant to a qualified management contract which conforms with I.R.S. regulation 26 C.F.R. § 1.141-3(b)(4). If a for-profit entity leases the property from the university and builds the project with financing from the public trust a different analysis would be required as to whether the bonds would be tax-exempt, but whether the lessee is a for-profit entity or a Section 501(c)(3) nonprofit corporation would not change the results of this Opinion. The applicable provisions of the Bond Oversight and Reform Act do not differentiate between for-profit or non-profit owners or managers of bond-financed projects. See 62 O.S. 2001, §§ 695.1-695.11[62-695.1-695.11].
[3] Id. § 695.7(A).
[4] Id. § 695.11A. On September 24, 2002 in In re OklahomaDepartment of Transportation, No. 97,419, 2002 WL 31110934, ___ P.3d ___ (Okla. 2002) (not yet released for publication), the Oklahoma Supreme Court held the Legislative Bond Oversight Commission unconstitutional. The Legislative Bond Oversight Commission was constituted under Section 695.4. The Act provides that if either the Legislative Bond Oversight Commission or the Executive Bond Oversight Commission is found unconstitutional, all of the powers and duties of these commissions shall devolve in a new entity to be known as the Council of Bond Oversight, a five-member board consisting of one member each appointed by the Speaker of the House and the President Pro Tempore of the Senate, two members appointed by the Governor with the advice and consent of the Senate, and the Director of State Finance. Based on the Court's ruling, the members of the Council have been appointed, and the Council will undertake the responsibilities of the above-named commissions. Id.